989 F.2d 1305
 36 ERC 1251, 61 USLW 2643, 23 Envtl.
L. Rep. 20,699
 CONNECTICUT COASTAL FISHERMEN'S ASSOCIATION,
Plaintiff-Appellee-Cross-Appellant,
v.
REMINGTON ARMS CO., INC., E.I. Dupont de Nemours & Co.,
Defendants-Appellants-Cross-Appellees.
 Nos. 1580, 1581, Dockets 92-7191, 92-7193.
 United States Court of Appeals,
Second Circuit.
 Argued June 11, 1992.
Decided March 29, 1993.
 
 Mark R. Sussman, Hartford, CT (R. Bradford Fawley, Everett E. Newton, Murtha, Cullina, Richter and Pinney, New York City, of counsel), for defendants-appellants-cross-appellees.
 Robert F. Kennedy, Jr., Natural Resources Defense Council, White Plains, NY (Kevin Desharnais, Kevin Doering, Frank C. Pavia, Legal Interns, John Jay Legal Services, of counsel), for plaintiff-appellee-cross-appellant.
 James H. Warner, Asst. Gen. Counsel, Nat. Rifle Ass'n, Washington, DC, submitted a brief for amici curiae National Rifle Ass'n of America.
 Douglas E. Kliever, Washington, DC (Cleary, Gottlieb, Steen & Hamilton, of counsel), submitted a brief for amici curiae National Shooting Sports Foundation, Inc.
 David A. Nicholas, Boston, MA (Charles C. Caldart, Nat. Environmental Law Center, of counsel), submitted a brief for amici curiae Massachusetts Public Interest Research Group, New Jersey Public Interest Research Group, Washington Public Interest Research Group, Illinois Public Interest Research Group, Ohio Public Interest Research Group, and Public Interest Research Group in Michigan.
 Nancy K. Stoner, Atty., U.S. Dept. of Justice, Washington, DC (Steven E. Silverman, U.S.E.P.A., of counsel), submitted a brief for amicus curiae U.S.
 Before CARDAMONE, WINTER and MAHONEY, Circuit Judges.
 CARDAMONE, Circuit Judge:
 
 
 1
 Critical on this appeal is the meaning of the terms "solid waste" and "hazardous waste," as these terms are defined in the Solid Waste Disposal Act, 42 U.S.C. §§ 6901-6992k (1988), as amended by the Resource Conservation and Recovery Act of 1976 (RCRA), Pub.L. No. 94-580, 90 Stat. 2795 (1976), and the Hazardous and Solid Waste Amendments of 1984, Pub.L. No. 98-616, 98 Stat. 3221 (1984). Defining what Congress intended by these words is not child's play, even though RCRA has an "Alice in Wonderland" air about it. We say that because a careful perusal of RCRA and its regulations reveals that "solid waste" plainly means one thing in one part of RCRA and something entirely different in another part of the same statute.
 
 
 2
 "When I use a word," Humpty Dumpty said in a rather scornful tone, "it means just what I choose it to mean--neither more nor less."
 
 
 3
 "The question is," said Alice, "whether you can make words mean so many different things."
 
 
 4
 "The question is," said Humpty Dumpty, "which is to be master--that's all."
 
 
 5
 Lewis Carroll, Through the Looking-Glass ch. 6 at 106-09 (Schocken Books 1987) (1872). Congress, of course, is the master and in the discussion that follows, we undertake to discover what meaning Congress intended in its use of the words solid and hazardous waste.
 
 
 6
 Remington Arms Co., Inc. (Remington or appellant) has owned and operated a trap and skeet shooting club--originally organized in the 1920s--on Lordship Point in Stratford, Connecticut since 1945. Trap and skeet targets are made of clay, and the shotguns used to knock these targets down are loaded with lead shot. The Lordship Point Gun Club (the Gun Club) was open to the public and it annually served 40,000 patrons. After nearly 70 years of use, close to 2,400 tons of lead shot (5 million pounds) and 11 million pounds of clay target fragments were deposited on land around the club and in the adjacent waters of Long Island Sound. Directly to the north of Lordship Point lies a Connecticut state wildlife refuge at Nells Island Marsh, a critical habitat for one of the state's largest populations of Black Duck. The waters and shore near the Gun Club feed numerous species of waterfowl and shorebirds.
 
 
 7
 Plaintiff, Connecticut Coastal Fishermen's Association (Coastal Fishermen or plaintiff) brought suit against defendant Remington alleging that the lead shot and clay targets are hazardous wastes under RCRA and pollutants under the Clean Water Act (Act), 33 U.S.C. §§ 1251-1387 (1988 & Supp. II 1990). Remington has never obtained a permit under § 3005 of RCRA for the storage and disposal of hazardous wastes, 42 U.S.C. § 6925, or a National Pollutant Discharge Elimination System (pollution discharge) permit pursuant to § 402 of the Clean Water Act, 33 U.S.C. § 1342. Plaintiff insists that Remington must now clean up the lead shot and clay fragments it permitted to be scattered on the land and in the sea at Lordship Point. Because the debris constitutes an imminent and substantial endangerment to health and the environment under RCRA, we agree.
 
 BACKGROUND
 
 8
 In response to citizens' concerns regarding the impact of the Gun Club operations on the surrounding environment, the Connecticut Department of Environmental Protection (DEP or the Department) began an investigation in May 1985 into possible contamination. Concluding that the Gun Club's activities "reasonably can be expected to cause pollution," the DEP issued an administrative order (Order WC4122) on August 19, 1985, requiring Remington to:
 
 
 9
 1) Investigate the extent and degree of lead contamination of sediments and aquatic life as a result of past and present activities of the Remington Gun Club....
 
 
 10
 2) Perform a study to evaluate the potential for lead poisoning of waterfowl as a result of past and present activities at the Remington Gun Club.
 
 
 11
 3) Take remedial measures as necessary to minimize or eliminate the potential for contamination of aquatic life and waterfowl.
 
 
 12
 Order WC4122 required that remedial action be completed in a year or by August 31, 1986, "except as may be revised by the recommendations of [a] detailed engineering study and agreed to by" the DEP. It did not order Remington to cease discharging lead shot or targets or to obtain a pollution discharge permit. The DEP did not then have authority to issue RCRA permits.
 
 
 13
 Meanwhile, pursuant to the DEP's August 1985 order, Remington commissioned a study by Energy Resources Company. The scope of the study was approved by the DEP on February 3, 1986. On April 10, 1986, plaintiff sent Remington a letter of intent to sue for Clean Water Act and RCRA violations, see 33 U.S.C. § 1365(b)(1)(A); 42 U.S.C. § 6972(b)(1)(A), complaining of the discharge of lead shot and clay targets. The completed Energy Resources study was submitted to the DEP on July 2, 1986--one month before the August deadline for complete remediation. Based on the results of this study, the Department modified Order WC4122 on October 24, 1986 (modified order). The modified order required Remington to cease all discharges of lead shot at the Gun Club by December 31, 1986 and to submit a plan detailing remediation options by April 30, 1987. It did not prohibit Remington from continuing to operate the Gun Club after December 31, 1986, if steel shot was used in place of lead shot.
 
 
 14
 In response to the modified order, Remington commissioned a study by Battelle Ocean Sciences (Battelle) to look into remediation alternatives. Again, the DEP approved the scope of the Battelle study, though the study did not address remediation of the clay target fragments. Remington submitted the results of the Battelle study to the DEP on January 1, 1988. In April 1988 the DEP invited the Coastal Fishermen to comment on the Battelle study. Plaintiff expressed on May 13 concern about the lack of any remediation option for the clay targets debris.
 
 
 15
 In September 1988 the DEP--focusing on this concern--directed Remington to investigate the effect of the clay targets on the environment. Remington asked Battelle to conduct a further study, which it submitted to the Department in February 1990. The DEP approved Battelle's latest report on June 8, 1990. As a result, but well over a year later, the DEP ordered Remington to supplement the proposed remediation plan to include removal of visible clay target fragments from the beach surface above the mean low water mark of Long Island Sound and to study the possible removal of targets from the water. Remington has now submitted the ordered supplemental report, and is awaiting its approval by the Department. It will have six months after the DEP approves the remediation plan to submit final engineering plans and a construction schedule. Because the proposed remediation plan involves dredging navigable waters of the United States, Remington will have to obtain permits from the U.S. Army Corps of Engineers. To date, none of the lead shot or the clay target fragments has been removed from Lordship Point or the surrounding waters of Long Island Sound.
 
 PRIOR PROCEEDINGS
 
 16
 The Coastal Fishermen's Association filed its original complaint on April 24 and amended it on October 21, 1987. The amended complaint alleges that the operation of the Gun Club involved the discharge of pollutants from a point source without a pollution discharge permit in violation of the Clean Water Act, and that because the lead shot and clay targets are hazardous wastes, the Gun Club is a hazardous waste storage and disposal facility subject to RCRA requirements. Plaintiff sought a declaration that Remington had violated and was violating both the Act and the RCRA orders compelling it to remedy the accumulations of shot and target debris. Plaintiff sought civil penalties and attorney's fees, but it did not ask to have the Gun Club's future activities enjoined.
 
 
 17
 Remington moved for summary judgment dismissing the complaint and plaintiff cross-moved for partial summary judgment on the issue of liability. On September 11, 1991, the United States District Court for the District of Connecticut (Burns, C.J.) ruled that it lacked jurisdiction over plaintiff's Clean Water Act causes of action because the DEP was "diligently prosecuting an action under a [comparable] State law," as provided in § 309(g)(6)(A)(ii) of the Act, 33 U.S.C. § 1319(g)(6)(A)(ii), precluding citizen suits. See Connecticut Coastal Fishermen's Ass'n v. Remington Arms Co., 777 F.Supp. 173, 177-86 (D.Conn.1991). Turning to the RCRA claims, the district court held that the lead shot and clay targets were "discarded material" under 42 U.S.C. § 6903(27), were "solid waste" under that statute, and therefore were subject to regulation under RCRA. See id. at 188-94. It further stated that the lead shot was a "hazardous waste," but believed there were genuine issues of material fact as to whether the clay targets were "hazardous waste" under RCRA. See id. at 194-95.
 
 
 18
 Remington sought interlocutory review of the RCRA holding and Coastal Fishermen cross-appealed the grant of summary judgment dismissing its Clean Water Act claims. Chief Judge Burns certified her decision for interlocutory review, and we accepted both petitions for review on February 11, 1992. Subsequent to oral argument on June 11, 1992, we asked the EPA to file an amicus brief "addressing whether lead shot and clay target debris deposited on land and in the water in the normal course of skeet and trap shooting is 'discarded material' within the meaning of 42 U.S.C. § 6903(22) so as to constitute 'solid waste' under [RCRA]." The EPA filed its brief on August 31, 1992 and the parties responded to the EPA's position with briefs filed on October 5, 1992. We now affirm the district court's Clean Water Act ruling, though we do so on different grounds. With respect to the RCRA holding, we reverse in part and affirm in part.
 
 DISCUSSION
 I CLEAN WATER ACT
 A. Overview
 
 19
 Analysis begins with a discussion of the Clean Water Act issues. That Act makes it unlawful for any person to discharge pollutants from any point source into navigable waters of the United States without obtaining a pollution discharge permit and complying with its terms. See 33 U.S.C. §§ 1311(a), 1342; Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n, 453 U.S. 1, 11, 101 S.Ct. 2615, 2622, 69 L.Ed.2d 435 (1981). A civil action may be brought against any person "alleged to be in violation of ... an effluent standard or limitation under this chapter." 33 U.S.C. § 1365(a)(1). In turn, "effluent standard or limitation" is defined as an "unlawful act under" § 1311(a). Id. § 1365(f)(1). Section 1311(a) provides that "[e]xcept as in compliance with [§ 1342, establishing the pollution discharge permit program], the discharge of any pollutant by any person shall be unlawful."
 
 
 20
 Plaintiff sets forth two theories of appellant's liability under the Clean Water Act. It claims first that Remington discharged pollutants from a point source without a proper permit. It contends alternatively that appellant's deposit of lead shot and clay targets into Long Island Sound is the discharge of "fill material" without an appropriate permit issued by the Secretary of the Army, in violation of § 404 of the Act. See 33 U.S.C. §§ 1311(a), 1344. Without dealing with the merits of these liability theories, Remington interposes two threshold defenses to defeat plaintiff's citizen suit: first, that plaintiff failed to allege a "state of either continuous or intermittent violation" of the Act and may not pursue claims under it for "wholly past" violations, Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., 484 U.S. 49, 57, 108 S.Ct. 376, 381, 98 L.Ed.2d 306 (1987); and, second, that even if plaintiff's suit is not for wholly past violations, it is nonetheless barred by the Connecticut DEP's diligent prosecution of the complained-of violations under a state law "comparable to" § 309(g). 33 U.S.C. § 1319(g)(6)(A)(ii). Because we find plaintiff's citizen suit must be dismissed under Gwaltney, we need not reach or decide the § 309(g) diligent prosecution issue upon which the district court grounded its holding.
 
 B. Present Violation
 
 21
 Section 505(a)(1) of the Clean Water Act grants citizens, acting as private attorneys general, the right--absent enforcement action by the EPA or state agencies--to bring civil actions against any person "alleged to be in violation of" the pollution discharge permit requirement. § 1365(a)(1). This requires a citizen-plaintiff to "allege a state of either continuous or intermittent violation--that is, a reasonable likelihood that a past polluter will continue to pollute in the future." Gwaltney, 484 U.S. at 57, 108 S.Ct. at 380. To satisfy federal subject matter jurisdiction, plaintiff's allegations of continuing violation must be made in "good faith." Id. at 64, 108 S.Ct. at 385.
 
 
 22
 A defendant may defeat a plaintiff's Clean Water Act suit by moving for summary judgment and demonstrating that the allegations of a continuing violation of the Act were a sham. See Sierra Club v. Union Oil Co. of Cal., 853 F.2d 667, 669 (9th Cir.1988). To survive such a motion, plaintiff must show that defendant's violations continued subsequent to the date the complaint was filed, or present proof from which a trier of fact could find a continuing likelihood that violations would recur. See Union Oil, 853 F.2d at 671; Chesapeake Bay Found. v. Gwaltney of Smithfield, Ltd., 844 F.2d 170, 171-72 (4th Cir.1988) (per curiam) (on remand from 484 U.S. 49 (1987)). The critical time for determining whether there is an ongoing violation is when the complaint was filed. See Atlantic States Legal Found. v. Tyson Foods, Inc., 897 F.2d 1128, 1134 (11th Cir.1990); Chesapeake Bay Found. v. Gwaltney of Smithfield, Ltd., 890 F.2d 690, 693-94 (4th Cir.1989); Hudson River Fishermen's Ass'n v. County of Westchester, 686 F.Supp. 1044, 1051 (S.D.N.Y.1988).
 
 
 23
 Doubts with respect to whether the allegations of continuing violations are a sham are resolved in favor of the citizen-plaintiff, and defendant has the burden of demonstrating that there are no genuine material factual disputes and that it is entitled to judgment as a matter of law. See Fed.R.Civ.P. 56(c). The substantive law is a guide as to which facts are material. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Accordingly, summary judgment dismissing a citizen-plaintiff's Clean Water Act suit for failure to satisfy the "in violation" requirement of § 505(a)(1) requires defendant to show there is no genuine dispute regarding the lack of credibility of plaintiff's allegations that repetition of pre-complaint violations is likely; that is to say, a trial court must be able safely to conclude that whatever continuing risk of pollution there may have been, it was at an end when the citizen suit was filed. See Union Oil, 853 F.2d at 670-71; Gwaltney, 844 F.2d at 172.
 
 
 24
 We are persuaded that the Coastal Fishermen's Clean Water Act suit fails because neither the original complaint filed in April, nor its amendment in October 1987, alleges an ongoing violation of the Act. Concededly, plaintiff's complaint alleges Remington is discharging pollutants--depositing lead shot and clay target debris--into Long Island Sound without a pollution discharge permit. Yet, as plaintiff admits, Remington ceased operation of the Gun Club by the time plaintiff filed suit in April 1987. The complaint did not seek injunctive relief against Remington, and Coastal Fishermen's amended complaint admits:
 
 
 25
 the discharges from the Remington Gun Club trap and skeet ranges [in]to the waters of the Long Island Sound and adjoining shores ceased on December 31, 1986 ...
 
 
 26
 Recognizing the jurisdictional difficulties posed by this admission, plaintiff's amended complaint continues, "nothing indicates that these discharges of lead or other materials will not resume at some later date."
 
 
 27
 The Coastal Fishermen believe that the Supreme Court's Gwaltney standard is satisfied by this allegation of future violation because it was made in "good faith." Such belief is misplaced here. Good faith allegations, it is true, will defeat a motion to dismiss on the pleadings for lack of subject matter jurisdiction. But once a defendant has come forward with evidence showing there is no genuine factual dispute with respect to an element of plaintiff's claim--that is, it is unlikely defendant will continue its illegal discharges--plaintiff must demonstrate more than good faith. It must present instead evidence from which a factfinder could find a likelihood of continuing violations. Plaintiff failed in the instant matter to carry this burden. It may not defeat defendant's motion for summary judgment simply by resting on the averments of its complaint. See, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). It must demonstrate more than "some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986), in order to avoid dismissal of its citizen suit complaint.
 
 
 28
 Remington persuasively declared that it made a "final irrevocable decision" never to reopen the Gun Club to trap and skeet shooting at any time in the future, and offers as support the fact that the trap and skeet houses--from which targets used to be thrown--were dismantled and removed from the Gun Club premises in November of 1988. When Coastal Fishermen filed its complaint in April 1987 it alleged a Clean Water Act violation concerning the Gun Club's discharge of lead shot. The DEP's modified order issued in October 1986 had already addressed that issue by requiring the Gun Club to cease all discharges of lead shot by December 31, 1986. The district court found no evidence that the Gun Club violated its modified order. See 777 F.Supp. at 185. Thus, no fair-minded juror could find that there was a likelihood in April 1987 that Remington would discharge lead shot in the future.
 
 
 29
 We recognize that the DEP never required Remington to cease operation of the Gun Club altogether. In fact, there is ample evidence in the record, consisting of internal company memoranda and press statements, that Remington attempted throughout the spring of 1987 to refit the Gun Club for steel shot. The last reference concerning this effort is dated June 12, 1987. It was not until October 1987 in its amended complaint that plaintiff alleged that discharging the steel shot also was a Clean Water Act violation. The Act's definition of "pollutant" does not distinguish between lead and steel shot; both are pollutants. See § 1362(6).
 
 
 30
 But this amendment came too late to save plaintiff's Clean Water Act complaint because in October 1987 there was no evidence that Remington was continuing in its efforts to use steel shot, or that it was violating or would violate the Act by discharging "other materials" into Long Island Sound. Similarly, plaintiff did not cure this pleading defect by alleging in its amended complaint that the lead shot previously deposited in the sound is a point source discharging pollutants as it dissolves. The present violation requirement of the Act would be completely undermined if a violation included the mere decomposition of pollutants. In sum, plaintiff's Clean Water Act suit against Remington was directed at wholly past violations. Hence, summary judgment was properly granted in Remington's favor dismissing plaintiff's suit against it.
 
 II RESOURCE CONSERVATION AND RECOVERY ACT
 A. Overview
 
 31
 Turning now to Remington's appeal from the district court's RCRA ruling, plaintiff asserts that Remington has been operating an unpermitted facility for the treatment, storage or disposal of hazardous wastes in violation of 42 U.S.C. § 6925 (a citizens suit claim under § 6972(a)(1)(A)) and has created an "imminent and substantial endangerment" to human health and the environment under § 6972(a)(1)(B). The district court did not distinguish between these causes of action in granting plaintiff summary judgment. Remington, as noted, never obtained a RCRA permit for the operation of its Gun Club facility, but contends that because lead shot and clay target debris are not "solid wastes"--and hence cannot be "hazardous wastes" regulated by RCRA--it is not subject to a permit requirement. In essence, Remington contends that RCRA does not apply to the Gun Club because any disposal of waste that occurred there was merely incidental to the normal use of a product.
 
 
 32
 RCRA establishes a "cradle-to-grave" regulatory structure for the treatment, storage and disposal of solid and hazardous wastes. Solid wastes are regulated under Subchapter IV §§ 6941-49a; hazardous wastes are subject to the more stringent standards of Subchapter III §§ 6921-39b. See B.F. Goodrich Co. v. Murtha, 958 F.2d 1192, 1201 (2d Cir.1992). Under RCRA "hazardous wastes" are a subset of "solid wastes." See 42 U.S.C. § 6903(5). Accordingly, for a waste to be classified as hazardous, it must first qualify as a solid waste under RCRA. See United Technologies Corp. v. EPA, 821 F.2d 714, 716 n. 1 (D.C.Cir.1987). We direct our attention initially therefore to whether the lead shot and clay targets are solid waste.
 
 B. Chevron Analysis
 
 33
 Our analysis of the definition of solid waste entails statutory interpretation as outlined in Chevron, U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837, 842-43, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). First, the reviewing court must address "whether Congress has directly spoken to the precise question at issue" by focusing on the language and structure of the statute itself, and then--if necessary--examine congressional purpose expressed in legislative history. Id.; accord American Mining Congress v. EPA, 824 F.2d 1177, 1182 (D.C.Cir.1987) (AMC I ). A clear legislative purpose ends our inquiry, but if "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." Chevron, 467 U.S. at 843, 104 S.Ct. at 2782; accord AMC I, 824 F.2d at 1182. In such case, we may not substitute our interpretation of the statute for that of an executive branch agency charged with administering it, but must defer to the agency's reasonable interpretation of an otherwise ambiguous statute.
 
 
 34
 We consider first the statutory definition of solid waste. RCRA defines solid waste as:
 
 
 35
 any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility and other discarded material ... resulting from industrial, commercial, mining and agricultural operations, and from community activities ...
 
 
 36
 42 U.S.C. § 6903(27) (emphasis added). Remington admits that its Gun Club is a "commercial operation" or a "community activity;" it challenges the district court's finding that the lead shot and clay target debris are "discarded material." The statute itself does not further define "discarded material," and this creates an ambiguity with respect to the specific issue raised by Remington: At what point after a lead shot is fired at a clay target do the materials become discarded? Does the transformation from useful to discarded material take place the instant the shot is fired or at some later time?
 
 
 37
 The legislative history does not satisfactorily resolve this ambiguity. It tells us that RCRA was designed to "eliminate[ ] the last remaining loophole in environmental law" by regulating the "disposal of discarded materials and hazardous wastes." H.R.Rep. No. 1491, 94th Cong., 2d Sess. 4 (1976), reprinted in 1976 U.S.C.C.A.N. 6238, 6241. Further, the reach of RCRA was intended to be broad.
 
 
 38
 It is not only the waste by-products of the nation's manufacturing processes with which the committee is concerned: but also the products themselves once they have served their intended purposes and are no longer wanted by the consumer. For these reasons the term discarded materials is used to identify collectively those substances often referred to as industrial, municipal or post-consumer waste; refuse, trash, garbage and sludge.
 
 
 39
 Id. at 2, 1976 U.S.C.C.A.N. at 6240 (emphasis added). Yet, the legislative history does not tell us at what point products have served their intended purposes. The statutory definition of "disposal" as "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water," 42 U.S.C. § 6903(3), while broad, sheds little light on this question. Remington's focus on RCRA as being intended to address only solid waste "disposal"--in the sense of the affirmative acts of collecting, transporting, and treating manufacturing or industrial by-products--clearly is too narrow because it ignores legislative aim and fails to take into account the often non-voluntary acts of depositing, spilling and leaking. The statute and legislative history do not instruct as to how far the reach of RCRA extends. Thus, we proceed to the second step of the Chevron analysis and consider the EPA's interpretation.
 
 
 40
 The RCRA regulations create a dichotomy in the definition of solid waste. The EPA distinguishes between RCRA's regulatory and remedial purposes and offers a different definition of solid waste depending upon the statutory context in which the term appears. In its amicus brief, the EPA tells us that the regulatory definition of solid waste--found at 40 C.F.R. § 261.2(a)--is narrower than its statutory counterpart. The regulations define solid waste as "any discarded material" and further define discarded material as that which is "abandoned." 40 C.F.R. § 261.2(a). Materials that are abandoned have been "disposed of." 40 C.F.R. § 261.2(b). According to RCRA regulations, this definition of solid waste "applies only to wastes that also are hazardous for purposes of the regulations implementing Subtitle C of RCRA." 40 C.F.R. § 261.1(b)(1). As previously noted, Subtitle C [Subchapter III] contains more stringent handling standards for hazardous waste, and hazardous waste is a subset of solid waste.
 
 
 41
 The regulations further state that the statutory definition of solid waste, found at 42 U.S.C. § 6903(27), applies to "imminent hazard" lawsuits brought by the United States under § 7003, 42 U.S.C. § 6973. See 40 C.F.R. § 261.1(b)(2)(ii). This statement recognizes the special nature of the imminent hazard lawsuit under RCRA. Currently, RCRA authorizes two kinds of citizen suits. The first, under § 7002(a)(1)(A), 42 U.S.C. § 6972(a)(1)(A), enables private citizens to enforce the EPA's hazardous waste regulations and--according to 40 C.F.R. § 261.1(b)(1)--invokes the narrow regulatory definition of solid waste. The second type of citizen suit, under § 7002(a)(1)(B), 42 U.S.C. § 6972(a)(1)(B), authorizes citizens to sue to abate an "imminent and substantial endangerment to health or the environment." While the regulations do not specifically mention this second category of citizen suit, regulatory language referring to § 7003 must also apply to § 7002(a)(1)(B) because the two provisions are nearly identical. Comite Pro Rescate de la Salud v. Puerto Rico Aqueduct and Sewer Auth., 888 F.2d 180, 187 (1st Cir.1989), cert. denied, 494 U.S. 1029, 110 S.Ct. 1476, 108 L.Ed.2d 613 (1990). Consequently, the broader statutory definition of solid waste applies to citizen suits brought to abate imminent hazard to health or the environment.
 
 
 42
 We recognize the anomaly of using different definitions for the term "solid waste" and that such view further complicates an already complex statute. Yet, we believe on balance that the EPA regulations reasonably interpret the statutory language. Hence, we defer to them. Dual definitions of solid waste are suggested by the structure and language of RCRA. Congress in Subchapter III isolated hazardous wastes for more stringent regulatory treatment. Recognizing the serious responsibility that such regulations impose, Congress required that hazardous waste--a subset of solid waste as defined in the RCRA regulations--be clearly identified. The statute directs the EPA to develop specific "criteria" for the identification of hazardous wastes as well as to publish a list of particular hazardous wastes. 42 U.S.C. § 6921(a) & (b). By way of contrast, Subchapter IV that empowers the EPA to publish "guidelines" for the identification of problem solid waste pollution areas, does not require explanation beyond RCRA's statutory definition of what constitutes solid waste. Id. § 6942(a). Hence, the words of the statute contemplate that the EPA would refine and narrow the definition of solid waste for the sole purpose of Subchapter III regulation and enforcement.
 
 C. Regulatory Definition of Solid Waste
 
 43
 The EPA, as amicus, concludes that the lead shot and clay targets discharged by patrons of Remington's Gun Club do not fall within the narrow regulatory definition of solid waste. Again, this issue is one we need not resolve because plaintiff has failed to allege a valid claim, brought under the § 7002(a)(1)(A) citizen suit provision, that Remington violated § 6925 of RCRA.
 
 
 44
 Plaintiff first alleges that Remington is operating a hazardous waste disposal facility without a permit, in violation of § 6925. This claim alleges a "wholly past" RCRA violation and is dismissed under Gwaltney. The Supreme Court acknowledged that the language in the citizen suit provisions of the Clean Water Act and § 7002(a)(1)(A) of RCRA is identical, yielding the same requirement that plaintiff allege an ongoing or intermittent violation of the relevant statute. Gwaltney, 484 U.S. at 57 & n. 2, 108 S.Ct. at 380 & n. 2; see also Ascon Properties, Inc. v. Mobil Oil Co., 866 F.2d 1149, 1159 (9th Cir.1989) (applying requirement of ongoing or intermittent violation to citizen suit brought under § 7002(a)(1)(A)). Because we find no valid allegation of a present violation with respect to Coastal Fishermen's Clean Water Act suit, we must reach the same result with respect to its first claim under § 7002(a)(1)(A) of RCRA.
 
 
 45
 Second, plaintiff alleges that Remington owns or is operating a hazardous waste storage facility without a permit in violation of § 6925. Because plaintiff's alleged "violation" would continue as long as the lead shot and clay targets are "stored" in the waters of Long Island Sound, Gwaltney does not bar this claim. But RCRA and its regulations do. RCRA defines "storage" as "the containment of hazardous waste, either on a temporary basis or for a period of years, in such a manner as not to constitute disposal of such hazardous waste." § 6903(33). Neither the statute nor its accompanying regulations define "containment," but "storage" is further defined in the regulations as "the holding of hazardous waste for a temporary period, at the end of which the hazardous waste is treated, disposed of, or stored elsewhere." 40 C.F.R. § 260.10 (1992). The lead shot and clay targets now scattered in the waters of Long Island Sound at no time have been contained or held.
 
 
 46
 Moreover, the very essence of Coastal Fishermen's complaint is that Remington left the debris in the Sound with no intention of taking additional action. Hence, the alleged storage of the waste logically may not be an interim measure as the regulations require. Coastal Fishermen therefore failed to state a valid claim that Remington owns or operates a hazardous waste storage facility or that it violated § 7002(a)(1)(A). Because only such a violation would trigger application of the regulatory definition of solid waste, it is unnecessary to decide whether the lead shot and clay targets fall within RCRA's regulatory scope.
 
 D. Statutory Definition of Solid Waste
 
 47
 Coastal Fishermen's allegation that the lead shot and clay target debris in Long Island Sound creates an "imminent and substantial endangerment" under § 7002(a)(1)(B) of RCRA need not meet the present violation hurdle. See Gwaltney, 484 U.S. at 57 n. 2, 108 S.Ct. at 380 n. 2; Ascon, 866 F.2d at 1159. An imminent hazard citizen suit will lie against any "past or present" RCRA offender "who has contributed or who is contributing" to "past or present" solid waste handling practices that "may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B). Therefore, under an imminent hazard citizen suit, the endangerment must be ongoing, but the conduct that created the endangerment need not be.
 
 
 48
 As already noted, RCRA regulations apply the broader statutory definition of solid waste to imminent hazard suits. The statutory definition contains the concept of "discarded material," 42 U.S.C. § 6903(27), but it does not contain the terms "abandoned" or "disposed of" as required by the regulatory definition. 40 C.F.R. §§ 261.2(a)(2), (b)(1). Amicus interprets the statutory definition of solid waste as encompassing the lead shot and clay targets at Lordship Point because they are "discarded." Specifically, the EPA states that the materials are discarded because they have been "left to accumulate long after they have served their intended purpose." Without deciding how long materials must accumulate before they become discarded--that is, when the shot is fired or at some later time--we agree that the lead shot and clay targets in Long Island Sound have accumulated long enough to be considered solid waste. Compare AMC I, 824 F.2d at 1185-86 (in-process secondary materials destined for immediate reuse as part of ongoing production process are not subject to RCRA because not discarded) with American Petroleum Inst. v. EPA, 906 F.2d 729, 741 (D.C.Cir.1990) (per curiam) (distinguishing AMC I on grounds that once product is "indisputably 'discarded'," it has become part of waste disposal problem and may be regulated under RCRA) and American Mining Congress v. EPA, 907 F.2d 1179, 1186-87 (D.C.Cir.1990) (AMC II) (same; deferring to the EPA's focus on potential environmental harm determining whether material is discarded).
 
 E. Hazardous Waste
 
 49
 Having resolved that the lead shot and clay targets are discarded solid waste, we next analyze whether they are hazardous waste. RCRA defines "hazardous waste" a
 
 
 50
 a solid waste, or combination of solid wastes, which because of its quantity, concentration, or physical, chemical, or infectious characteristics may--
 
 
 51
 * * * * * *
 
 
 52
 (B) pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed.
 
 
 53
 42 U.S.C. § 6903(5)(B).
 
 
 54
 Certain wastes have been listed by the EPA as hazardous pursuant to 40 C.F.R. § 261.30. Alternatively, a waste is considered hazardous if it exhibits any of the characteristics identified in 40 C.F.R. §§ 261.20 through 261.24: ignitability, corrosivity, reactivity, or toxicity. The district court granted summary judgment in favor of plaintiff on the issue of whether the lead shot qualified as a hazardous waste, but at the same time stated there were genuine issues of material fact as to whether the clay targets were hazardous waste. 777 F.Supp. at 194-95. Remington objects to both rulings.
 
 1. Lead Shot
 
 55
 The district court concluded that the lead shot was hazardous waste as a matter of law because it satisfied the requirements of 40 C.F.R. § 261.24 for toxicity. See 777 F.Supp. at 194. That regulation provides that a solid waste is toxic, and therefore hazardous if, using appropriate testing methods, an "extract from a representative sample of the waste contains any of the contaminants listed ... at the concentration equal to or greater than" that specified. 40 C.F.R. § 261.24(a). For lead, the concentration threshold is 5.0 mg/L. Id. table 1.
 
 
 56
 The Battelle study commissioned by defendant outlines the test method utilized as in accordance with EPA procedures, and was of the view that
 
 
 57
 Forty-five percent of the sediment samples analyzed exceeded the [applicable limits for lead]. On the basis of these results, upland disposal of the sediments as they currently exist in the environment at Lordship Point would require use of a RCRA-certified hazardous waste disposal site.
 
 
 58
 Remington does not challenge the accuracy or methodology of the Battelle study that clearly demonstrates that both the sediment at Lordship Point and the lead shot itself are toxic within the meaning of 40 C.F.R. § 261.24. The Battelle study further opines that "the accumulation of lead in the tissues of mussels and ducks [is] sufficient to indicate a lead contamination problem requiring remediation at Lordship Point." As a matter of law, the lead shot is a solid waste which, due to its toxicity and the fact that it poses a substantial threat to the environment, is a hazardous solid waste subject to RCRA remediation and regulation.
 
 
 59
 Amicus, National Rifle Association (NRA), contends that because RCRA must be "integrated" with other environmental statutes, see 42 U.S.C. § 6905(b), and because the Toxic Substances Control Act exempts from the definition of "toxic substance" shells and cartridges for use in firearms, see 15 U.S.C. § 2602(2)(B)(v) (1988); 26 U.S.C. § 4181 (1988), the lead shot should not be classified as a hazardous waste (presumably because it should not be considered "toxic") under RCRA.
 
 
 60
 NRA misreads the Toxic Substances Control Act. The section relied on, 15 U.S.C. § 2602(2), does not purport to define "toxic" substances, but rather defines "chemical" substances. Again, the "integration" is designed "for purposes of administration and enforcement and [to] avoid duplication," 42 U.S.C. § 6905(b)(1), not, as NRA urges, for the perilous purpose of engaging in a far-ranging search through the United States Code for exemptions from particular provisions of one environmental statute in order to apply them to another. Cf. Murtha, 958 F.2d at 1202-03 (rejecting attempt to incorporate RCRA exemptions into CERCLA).
 
 
 61
 In fact, were RCRA to be integrated with other environmental statutes, it would seem more appropriate to look to the Migratory Bird Treaty Act, pursuant to which the Secretary of the Interior has approved regulations promulgated by the Fish and Wildlife Service, prohibiting the use of lead shot in 12 gauge or larger shotguns when duck hunting. See National Rifle Ass'n v. Kleppe, 425 F.Supp. 1101 (D.D.C.1976) (upholding regulations), aff'd mem., 571 F.2d 674 (D.C.Cir.1978). More fundamentally, the distinction between "substances" and "wastes" is "a substantial one [which] should be preserved, absent a clear legislative intent to the contrary." Murtha, 958 F.2d at 1202.
 
 2. Clay Targets
 
 62
 Remington declares the clay targets cannot be hazardous waste merely because they contain hazardous wastes listed in 40 C.F.R. § 261.33(f). Regardless of whether this assertion properly interprets 40 C.F.R. § 261.33(d) (comment), it is irrelevant. The district court did not decide that there was a genuine issue as to whether the clay targets were hazardous because it was not yet determined whether they contain hazardous wastes listed in 40 C.F.R. § 261.33(f). Rather, it ruled this issue remained undecided because the appropriate tests to determine toxicity under 40 C.F.R. § 261.24 had not yet been completed. 777 F.Supp. at 195.
 
 
 63
 F. Other Arguments Raised by Remington and Amici
 
 
 64
 Remington and the National Shooting Sports Foundation, in an amicus brief, urge that subjecting trap and skeet shooting ranges to RCRA would be a costly and difficult process that might have the effect of closing them down. Because Coastal Fishermen's citizen suit under § 7002(a)(1)(A) must be dismissed for failure to make a valid allegation of a § 6925 violation, we do not decide whether trap and skeet shooting ranges fall within RCRA Subchapter III regulations.
 
 
 65
 Amicus additionally contends that imposing liability under RCRA is an impermissible imposition of liability for past lawful conduct. This contention misperceives the nature of the presumption against retroactive application of a statute to conduct lawful when done. Connecticut Coastal Fishermen only seeks appropriate relief under RCRA for Remington's operation of the club subsequent to the effective date of RCRA and its applicable regulations. Merely because from such time until suit was filed no action was taken to enforce RCRA against defendant does not mean the statute is being retroactively applied. See United States v. Cumberland Farms of Conn., Inc., 826 F.2d 1151, 1162 (1st Cir.1987), cert. denied, 484 U.S. 1061, 108 S.Ct. 1016, 98 L.Ed.2d 981 (1988).
 
 CONCLUSION
 
 66
 For the foregoing reasons, the judgment of the district court is affirmed, in part, and reversed, in part.