Roger STONE, Plaintiff,

v.

NAPERVILLE PARK DISTRICT, a municipal corporation; Naperville Sportsman's Club, an Illinois not for profit corporation; and City of Naperville, a municipal corporation, Defendants.

No. 98 C 1881.

United States District Court,
N.D. Illinois,
Eastern Division.

Feb. 17, 1999.

652

Andrew H. Perellis, Phillip Brian Straub, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, for Roger Stone.

James Russell Morrin, Leo Patrick Dombrowski, Lawrence W. Falbe, Wildman, Harrold, Allen & Dixon, Chicago, IL, Gerald J. Brooks, Richard John Tarulis, Dmitry N. Feofanov, Brooks, Adams & Tarulis, Naperville, IL, for Naperville Park District.

James Russell Morrin, Leo Patrick Dombrowski, Lawrence W. Falbe, Wildman, Harrold, Allen & Dixon, Chicago, IL, Robert J. Schillerstrom, Schillerstrom & Cresto, Ltd., Naperville, IL, for Naperville Sportsman's Club.

James Russell Morrin, Leo Patrick Dombrowski, Lawrence W. Falbe, Wildman, Harrold, Allen & Dixon, Chicago, IL, Michael M. Roth, Howard P. Levine, Paul

L. Stephanides, City of Naperville, Naperville, IL, for City of Naperville.

## MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

Roger Stone filed this lawsuit claiming that the defendants' operation of a trap shooting facility violates the Clean Water Act, 33 U.S.C. § 1251 *et seq.,* by discharging lead shot, a pollutant, into the navigable waters of the United States without the authorizing permit required by §§ 1311 and 1342 of the Act. The case is before this Court on Stone's summary judgment motion. For the reasons that follow, we grant judgment to Stone as to the defendants' liability under the Act and enjoin the defendants from further violations of the Act. However, we conclude that further proceedings are necessary on Stone's request for remediation, civil penalties, and litigation costs.

The Naperville Park District and Naperville Sportsman's Club jointly operate a trap shooting facility on land, commonly referred to as Sportsman's Park, leased from the City of Naperville in 1988. The Park is approximately 27 acres, is comprised partially of wetlands (9.9 acres according to at least one survey), and contains two ponds (creatively named North Pond and South Pond) connected by a man-made equalization channel. Not surprisingly, the Park provides a habitat for diverse wildlife. The equalization channel is approximately 30 feet wide and stretches 525 feet between the two ponds.[1] The defendants concede that these bodies of water are "navigable waters of the United States" as defined by the Act.

Trap shooting is a sport during which individuals with shot guns shoot at airborne clay targets.[2] Toward this end, the Park provides three flat, concrete "firing stations"[3] that accommodate up to five shooters each; several "target throwers"; and a fenced "shotfall zone" (the area into which shooting debris falls to the ground). The shortfall zone encompasses the entire equalization channel, as well as land on both sides of the channel and a small portion of South Pond. (*See, e.g.,* 12M Statement Ex. B at 2, Map prepared by Engineering Resource Associates.) All of the shot used at the Park is lead; the targets are clay. Trap shooting at the Park results in the wide distribution of lead shot and clay fragments within the shotfall zone, including in and around the equalization channel. At the time this lawsuit was filed in March 1998, the trap shooting range was opened to the public approximately ten hours per week, and weekly classes in trap shooting were conducted regularly. Although Stone had repeatedly challenged the legality of operating the range without a permit, as of March 1998, the defendants neither possessed a permit nor had applied for such a permit.

On July 8, 1998, the United States Environmental Protection Agency ("EPA") advised the defendants that a National Pollutant Discharge Elimination System ("NPDES") permit was required for trap shooting at the Park. (12M Statement Ex. A., Letter from EPA to Richard J. Tarulis

---

1. Neither party provides the precise dimensions of the channel; therefore, we have made this very rough estimate based on the various maps and surveys contained throughout the record.

2. In trap shooting, the target thrower propels the clay target away from the shooter, thereby distinguishing the sport from skeet shooting, in which the target is thrown across the shooter's line-of-sight.

3. For reasons that are not explained, the defendants quibble with the term "shooting plat-

form". *See, e.g.,* 12N Statement at ¶ 39 ("There are no shooting platforms at [the Park]. A person shooting at the targets stands on a flat, concrete pad . . . ."). Although we do not understand the relevance of the distinction between a "platform" and a "pad", we will use the term "firing station"—the phrase used in the defendants' own commercial literature. (12M Statement Ex. H, Naperville Park District Autumn Program Guide at 12.)

of July 8, 1998 ("July 8 Letter").) The EPA based its determination on the Reconnaissance Inspection Report completed after EPA inspectors surveyed the Park.[4] In response to the July 8 letter, the defendants halted shooting at the Park and applied for a permit. (12M Statement Ex. I, Naperville Park Dist. Press Release of July 10, 1998 (announcing temporary suspension of trap shooting); Ex. HH, Sportsman's Park EPA Form 3510–10 (datestamp received Aug. 28, 1998).) That application is still pending. In his motion for summary judgment, Stone argues that the debris discharged into the channel as a result of trap shooting violates the Clean Water Act because the defendants do not have an NPDES permit allowing such discharge.

## I. Standing and Mootness

■ Initially, we must address the defendants' contentions that Stone does not have standing under the Act, and that this case is moot. Although both arguments were resolved by this Court's order of November 30, 1998, we believe a more extensive statement of our reasoning would be useful. As to standing, the defendants argue that Stone has not submitted any evidence that he has been harmed by their lack of a permit and, therefore, he does not have standing to challenge their activities. We disagree with the defendants' contention that Stone has not pointed to evidence of an injury. At his deposition, Stone testified that he has used the Park in the past, intends to use it in the future, and that the pleasure he derives from his use of the Park is diminished by activities at the trap shooting range. Specifically, he testified that the visible debris from the shooting range is widespread and ugly, and that he believes wildlife diversity has decreased over time. This evidence satisfies the dictates of *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562–63, 112 S.Ct.

2130, 119 L.Ed.2d 351 (1992). *Compare Long Island Soundkeeper Fund, Inc. v. New York Athletic Club*, No. 94 Civ. 0436, 1996 WL 131863, at * 4–5 (S.D.N.Y. Mar.22, 1996) (affidavits attesting to diminished enjoyment of area surrounding trap shooting range sufficient to establish standing under Clean Water Act).

■ The defendants also maintain that the case is moot because they have voluntarily ceased activities at the trap-shooting range and have applied for an NPDES permit. "It is well settled [however] that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289, 102 S.Ct. 1070, 71 L.Ed.2d 152 (1982); *see also Atlantic States Legal Found., Inc. v. Stroh Die Casting Co.*, 116 F.3d 814, 820 (7th Cir. 1997) ("If the violation [of the Clean Water Act] is cured at some point while the suit is pending ... the case nevertheless does not become moot."). Instead, a "defendant must demonstrate that it is absolutely clear that the alleged wrongful behavior could not reasonably be expected to recur." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 66, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987). The defendants do not point to any evidence assuring us that their challenged activities will not recur. *Compare Connecticut Coastal Fishermen's Assoc. v. Remington Arms Co.*, 989 F.2d 1305, 1312 (2d Cir.1993) ("Remington persuasively declared that it made a 'final irrevocable decision' never to reopen the Gun Club to trap and skeet shooting at any time in the future, and offers as support the fact that the trap and skeet houses ... were dismantled and removed.").

More decisively determinative on the mootness issue, however, is the Seventh

---

**4.** The Reconnaissance Report is attached to the July 8 letter, which is at exhibit A of Stone's 12M Statement.

Circuit's holding in *Atlantic States:* a plaintiff's request for statutory damages under the Clean Water Act renders a case non-moot. 116 F.3d at 820. Stone seeks statutory damages under § 1319(d), as well as a clean-up order. For these reasons, we hold that Stone has standing to bring this lawsuit, and that the case is not moot.[5]

## II. The Merits

The Clean Water Act prohibits discharge of pollutants into navigable waters from a point source without a permit. *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 308, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982) (citing 33 U.S.C. §§ 1311(a), 1323(a)[6]); *Atlantic States Legal Found.,* 116 F.3d at 818. The defendants do not dispute that lead shot and clay targets are "pollutants", that the equalization channel is "navigable water", or that they lack a permit. (12N Statement at ¶¶ 12–23, 37, 41, 48, 53; Defs. Mem. at 2.) Instead, they argue that the trap shooting range and the firing stations do not constitute "point sources" and, therefore, Stone cannot establish a violation of the Act on the merits. Alternatively, the defendants contend that, even if activities at the trap shooting range "technically" violate the Act, Stone cannot demonstrate entitlement to any relief available from this Court. We address each argument in turn.

### A. Point Source

■ The Clean Water Act defines a "point source" as "any discernable, con-

fined and discrete conveyance ... from which pollutants are or maybe discharged." 33 U.S.C. § 1362(14). We believe that the trap shooting range, as well as each firing station, constitutes a "point source" as defined by the Act. The whole purpose of the facility is to "discharge pollutants" in the form of lead shot and shattered clay targets. In fact, within the shotfall zone, no other activity occurs. Furthermore, the facility is certainly "discernible, confined and discrete". *Compare Long Island Soundkeeper Fund,* 1996 WL 131863, at * 14 ("The trap shooting range operated by Defendant, which is designed to concentrate shooting activity from a few specific points and systematically direct it in a single direction ..., is an identifiable source from which spent shot and target fragments are conveyed into navigable waters.").

The defendants appear to argue that the facility and the firing stations do not constitute "conveyances" in that individual shooters actually deliver the lead shot into the shotfall zone: "the range is a place, wholly unlike a discrete item like a pipe or container, that does not discharge or channel anything." (Defs.' Mem. at 10.) This argument is simply wrong. The range "channels" shooting by providing a facility at which individuals may shoot; it channels the discharge of pollutants by inviting individuals to come shoot at airborne clay targets that land in the water with lead shot that also lands in the water.[7]

5. Although the defendants' standing and mootness arguments are unavailing, the premise of those arguments—that Stone has not definitively established harm—is relevant to whether Stone has established his case for injunctive and statutory relief. *See, e.g., City of Mesquite,* 455 U.S. at 289, 102 S.Ct. 1070 ("[A]bandonment [of challenged activity] is an important factor bearing on the question whether a court should exercise its power to enjoin the defendant from renewing the practice."); *see also Atlantic States Legal Found.,* 116 F.3d at 820 ("If the violation [of the Clean Water Act] is cured at some point while the suit is pending .... [i]t may be possible that the citizen plaintiffs would lose their

right to an injunction, if ... it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." (quotation omitted).). Thus, we consider the arguments in that context.

6. *Romero–Barcelo* involved a claim against a federal facility; the permit process for federal facilities is governed by § 1323. The comparable provision governing permit applications of other entities, like the defendants in this case, is § 1342.

7. The defendants' attempt to analogize the firing stations to public sidewalks is just silly;

The defendants have failed to establish a triable issue as to whether they have violated the Clean Water Act by discharging pollutants into navigable waters without the appropriate permit. The undisputed facts instead establish that the defendants have violated the Clean Water Act. Therefore, we grant summary judgment in favor of Stone on the issue of the defendants' liability under the Act. We turn now to the defendants' claims regarding the appropriate relief.

## B. Remedies

Stone seeks four principle types of relief against the defendants: an injunction against future violations of the Act; an injunction ordering remediation of the site; civil penalties under 33 U.S.C. § 1319(d); and attorneys fees and costs. Stone concedes that further proceedings are necessary to determine the issues of civil penalties and litigation costs; therefore, we do not analyze these claims here. He believes, however, that this Court should immediately enter an order enjoining the defendants against further violations of the Act and instructing them to submit a remediation plan. The defendants primarily attack Stone's request for a clean-up order, but also argue generically that Stone cannot meet the standards for obtaining an injunction because he has not shown an irreparable injury resulting from the defendants' lack of a permit.

## A. Injunction Against Future Violations

The Clean Water Act does not dictate injunctive relief for any violation of its permit provisions. *Romero–Barcelo,* 456 U.S. at 317–18, 102 S.Ct. 1798. Instead, Congress envisioned courts exercising equitable discretion "to order that relief it considers necessary to secure prompt compliance with the Act." *Id.* at 320, 102 S.Ct. 1798. The defendants argue that an injunction is unnecessary because they are currently in compliance with the Act: they voluntarily ceased trap shooting activities at the range and have applied for a NPDES permit. Initially we note that voluntary cessation of statutory violations does not bar issuance of an injunction. *See Hecht Co. v. Bowles,* 321 U.S. 321, 327, 64 S.Ct. 587, 88 L.Ed. 754 (1944).

█ In deciding whether to issue an injunction, this Court must balance the possible injuries to the parties of either granting or denying injunctive relief, paying "particular regard [to] the public consequences in employing the extraordinary remedy of injunction." *Romero–Barcelo,* 456 U.S. at 312, 102 S.Ct. 1798. Additionally, we must consider the traditional touchstones of irreparable injury and the adequacy of legal remedies. *Id.*

█ The balance of harms weighs in favor of injunctive relief against future violations of the Act. Such an order impacts the defendants' side of the scale minimally: they have already ceased trap shooting at the range and have applied for a permit from the EPA. The defendants divulge that the EPA is acting on their permit application, and that it is obligated to act within a "time certain".[8] Therefore, the injunction under consideration would cause them little harm.

On the Stone side of the scale, the denial of an injunction against future violations could result in irreparable harm. Although Stone has not established definitively that the defendants' activities have cause measurable, concrete harm to humans or wildlife—the parties have submitted sufficient evidence on the issue of harm to create a triable fact question—the purpose of the Act is not simply to prevent harm. Instead, Congress also aimed to "maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The defendants' violation of the Act has been established. It

---

people may not discharge lead shot from guns on public sidewalks.

**8.** The defendants, however, do not reveal the EPA's actual time limitations.

follows then that their activities constitute an assault on the integrity of the Nation's waters. Furthermore, the record shows that the defendants have been somewhat reticent to comply with the Act, although Stone has been urging such compliance for a considerable period of time. Absent an injunction there is a chance—perhaps only slight, but a chance—that the defendants would resume trap shooting in violation of the Act.

Finally, we consider the limited duration of the proposed injunction. Once the EPA decides the permit application, any injunction entered under the terms proposed here would be moot. For example, should the EPA issue a permit, trap shooting at the range would no longer be in violation of the Act; similarly, if the application is denied and the defendants resumed trap shooting, the injunction would be unnecessary to establish liability for those activities.

Because the harm to Stone of not judicially prohibiting the defendants' violation of the Act outweighs the harm to defendants of requiring strict compliance with the Act, this Court exercises its discretion to enjoin the defendants from any further violations of the Clean Water Act. The defendants therefore shall not engage in any trap shooting without the required NPDES permit.

### B. Clean–Up Order

Stone's quest for an injunction ordering the defendants to submit a remediation plan—in essence a request for a clean-up order—involves an entirely different calculation. Here, the defendants' evidence casting doubt on the existence of harm to Stone or the environment weighs heavily against imposing the significant cost of a clean-up on the defendants. The factual issue of harm and its extent must be answered before this Court can make a coherent determination as to whether a clean-up order is warranted. Instead the parties are requested to meet and attempt to agree upon an acceptable remediation plan. If such a plan cannot be agreed upon, Stone will be allowed to propose an appropriate plan on or before April 1, 1999.

### CONCLUSION

For the reasons stated above, we grant in part and deny in part Stone's amended motion for summary judgment. Specifically, we grant judgment in favor of Stone on the issue of the defendants' violation of the Clean Water Act, and grant his request for an order enjoining the defendants from resuming trap shooting without an NPDES permit. However, we currently deny judgment on Stone's request for an injunction ordering the defendants to submit a clean up plan.

The Clerk of the Court is directed to enter judgment on liability, pursuant to Federal Rule of Civil Procedure 58, in favor of Stone and against the defendants. This Court will retain jurisdiction to consider all remaining issues of relief in this lawsuit.