**ATLANTIC STATES LEGAL FOUNDATION, INC.,**
**Plaintiff–Appellant,**

v.

**STROH DIE CASTING CO.,**
**Defendant–Appellee.**

No. 96–2063.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 21, 1996.
Decided June 17, 1997.

Dennis M. Grzezinski (argued), Milwaukee, WI, for Plaintiff–Appellant.

John H. Niebler (argued), Niebler, Pyzyk & Wagner, Menomonee Falls, WI, for Defendant–Appellee.

Before MANION, DIANE P. WOOD, and EVANS, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

Although this environmental case has been pending since 1989, during most of its life it has languished in the court. In the meantime, not surprisingly, the conditions about which the citizen plaintiffs originally complained have changed, perhaps substantially. It began when the Atlantic States Legal Foundation filed it as a citizen suit under the Federal Water Pollution Control Act (or Clean Water Act), 33 U.S.C. § 1365, seeking relief for past violations of National Pollutant Discharge Elimination System (NPDES) permits by the Stroh Die Casting Company in Milwaukee. Believing the statutory notice that Atlantic provided to Stroh insufficient to encompass its complaint about the principal point source at issue here, and further finding that no reasonable jury could conclude that Stroh was an "intermittent or continuous" violator with respect to the two other point sources Atlantic identifies, the district court granted Stroh's motion for summary judgment and dismissed Atlantic's suit. In our view, the district court read Atlantic's notice too narrowly. Furthermore, its conclusion that at the time the suit was filed Stroh was not at least an intermittent violator for one of the contested outfalls is inconsistent with the Supreme Court's decision in *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation*, 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987). We therefore reverse and remand.

# I

Stroh produces zinc and aluminum castings at its Milwaukee plant. In the course of its operations, it discharges industrial wastewater through various outfalls to sanitary or municipal sewers run by the Milwaukee Metropolitan Sewerage District (MMSD), which eventually empty into Lake Michigan. It also discharges "non-contact cooling water," which is heated tap water, through storm sewers regulated by the Wisconsin Department of Natural Resources (WDNR) into the Bluemound tributary of the Menomonee River. As of November 1988, Stroh had a WDNR permit that allowed it to discharge the "non-contact cooling water" into the Bluemound, but it had no permit at all to discharge zinc- and phenol-contaminated industrial wastewater into the MMSD sanitary sewerage system.

This prompted Atlantic, an environmental organization with Wisconsin members, to send a letter on November 8, 1988 giving Stroh notice of violations of its WDNR discharge permit. (Despite the implication from its name that Atlantic had little connection with the Great Lakes, the complaint alleged that members of Atlantic resided in Wisconsin, in the vicinity of Lake Michigan, or they owned property or used Lake Michigan for recreational purposes, and thus were affected by Stroh's discharge of pollutants into the Lake. Stroh did not challenge Atlantic's standing to sue in any of its motions for summary judgment.) Under 33 U.S.C. § 1365(b), Atlantic had to give Stroh notice at least 60 days prior to suing it for those violations. The November 1988 notice alleged that Stroh had several times exceeded the daily maximum discharge limits for oil, grease, and biological oxygen demand 5 (BOD5) allowed under the WDNR permit for WDNR outfalls (discharge points) 1 and 3. On January 23, 1989, Atlantic filed a complaint against Stroh based on the November 1988 notice. Stroh moved shortly thereafter to dismiss Atlantic's claims for lack of subject matter jurisdiction, claiming that it was not "in violation" of the statute at the time of suit, because it was neither a continuous nor an intermittent violator as required by *Gwaltney*.

Rather than submitting a brief in opposition to Stroh's motion to dismiss, Atlantic chose on April 13, 1989, to send Stroh a second 60–day notice of intent to sue. The April 1989 notice alleged that Stroh had exceeded its maximums for zinc, phenol, oil and grease on several occasions at WDNR outfall 3. The April notice also alleged that Stroh had been discharging die casting process wastewater to the MMSD sanitary sewers since October 31, 1988, without a pretreatment discharge permit and in violation of the categorical standards of 40 CFR Chapter 464. It itemized certain specific violations at

MMSD outfall 3 (not to be confused with the WDNR storm sewer outfall 3 that was the subject of the first notice) and accused Stroh of a "history of effluent standard violations." Stroh's own records, the notice claimed, showed that its discharges were not in compliance as of January 31, 1989, and that compliance was not expected until January 10, 1990. It concluded that "[s]uch violations are known to the Discharger and may be included in future legal actions by Notifier."

Stroh responded by obtaining an MMSD permit on July 28, 1989, that authorized it to discharge die casting wastewater to MMSD sewers through Stroh's Abcor treatment unit. At this point, the designation of outfalls becomes somewhat confusing, because the MMSD outfalls defined under the July 1989 permit were different from the identically numbered outfalls covered by the WDNR discharge permit described in Atlantic's November 1988 notice. Stroh's MMSD permit defined the following outfalls:

MMSD Outfalls 1.1, 1.2, and 1.3: handled discharges from the parts washer conversion coating, a three-stage washer that discharged each tank separately

MMSD Outfall 2: handled domestic waste only, unlimited under the MMSD permit

MMSD Outfall 3: handled discharge from the Abcor unit, which treated waste from die casting, mold cooling leakage, casting quench, and machining

MMSD Outfalls 4.0, 4.1, and 4.2: 4.0 was the sump pit through which wastewater from the parts washer and the deburring operation were directed; 4.1 and 4.2 were the batch discharges from the two-stage parts washer

MMSD Outfall 5: handled cooling water only, unlimited under the MMSD permit

Stroh's MMSD monitoring summary showed that it was not able consistently to meet the discharge limitations for zinc that applied to MMSD outfall 3, as violations occurred in June 1989 and October 1989.

Meanwhile, back in the district court, nothing was happening with the lawsuit. On the assumption that the case had been settled, the district court entered an order dismissing Atlantic's suit without prejudice on November 14, 1989, noting that it had not filed a brief responding to Stroh's motion to dismiss and had thus waived the right to do so under the court's local rules. Six months later, on May 7, 1990, Atlantic filed an amended complaint, which the district court accepted, reopening the case on May 8, 1990. Stroh moved to vacate the order reopening the case and to dismiss Atlantic's amended complaint, but the court took no action on the motion for two years. On April 16, 1992, Judge Warren, before whom the case had been pending, denied Stroh's motions. Later in 1992, both parties filed motions for summary judgment. Another four years passed, by which time the case had been transferred to Judge Randa. On March 22, 1996, he granted Stroh's motion for summary judgment dismissing the amended complaint and denied Atlantic's motion. This time, final judgment was entered on the order of dismissal on March 26, 1996 and this appeal followed.

Time was not standing still between 1990 and 1996, however, even if the case was. On May 29, 1990, shortly after Atlantic filed its amended complaint, Stroh wrote to the MMSD explaining why it had failed to meet the April 10, 1990, deadline for starting up its wastewater treatment system. It conceded that it was not in compliance with the MMSD permit at that time, but it expressed the hope that the new system would cure the problem. Then, on July 1, 1990, something reminiscent of the game of hiding a pea under one of several cups occurred. On that date, Stroh abandoned existing MMSD outfall 3 (which was the outfall mentioned in the April 1989 notice and the MMSD permit) and re-routed its industrial process wastewater to "outfall 4," necessitating the issuance of a modified MMSD permit in October 1990 to reflect the changes. The new outfall 4 was not the same outfall 4 that the July 1989 MMSD permit had described, however. Recall that the July 1989 MMSD permit labeled "outfalls 4.0, 4.1, and 4.2" as the sump pump from the parts washer and deburring operations and the batch discharges from the parts washer itself. By contrast, the October 1990 modified MMSD permit retroactively relabeled "outfall 4" as the sampling station located downstream of Stroh's pretreatment system. The discharge from the Abcor unit,

which had formerly gone through MMSD outfall 3, was rerouted first through the new (but as yet inoperative) wastewater treatment system, where the zinc and phenols were to be removed, and then it was to be piped to the new, single MMSD outfall 4.

Samples taken from the new outfall 4 in July 1990 showed continued violations of effluent standards for zinc, lead, and phenols. MMSD issued notices of noncompliance to Stroh relating to discharges from the new outfall 4 in October 1990, November 1990, January 1991, and June 1991. MMSD then published a notice in the *Milwaukee Journal* on March 29, 1992, which listed Stroh as one of 15 industrial users that were in significant noncompliance with applicable effluent discharge standards during 1991.

Last, returning to the WDNR storm sewer system, Atlantic presented evidence indicating that Stroh continued to discharge non-processed water into the Bluemound tributary in violation of its WDNR permit. A Discharge Monitoring Report, whose accuracy Stroh contests, was received by the WDNR on April 16, 1992, in which Stroh reported discharging 11 milligrams per liter of oil and grease at WDNR storm sewer outfall 3 on February 6, 1992, which was 1 milligram over the per liter daily maximum allowed under its permit. Based on this contested evidence, Atlantic claims that the district court should not have dismissed its claims relating to WDNR outfalls 1 and 3.

## II

Although the facts are somewhat complicated (made more so by the proliferation of outfalls that seem to have the same number until one takes a more careful look), the legal questions in this case are fairly straightforward. The first and most important question is whether Atlantic's April 1989 notice satisfied the jurisdictional prerequisite imposed by the Clean Water Act, 33 U.S.C. § 1365(b), for Atlantic's citizen suit about industrial discharges into the MMSD system. Within that general issue are three subsidiary points: first, was Atlantic's April 1989 notice specific enough about the alleged violation to encompass its claims about what eventually became new outfall 4; second, was Stroh at the time

suit was brought a "continuing or intermittent" violator of the Act such that Atlantic would then have been entitled to an injunction; and third, what is the effect, if any, of the long delay between the November 1989 dismissal without prejudice (on which no Rule 58 final judgment was ever entered) and the district court's discretionary decision to accept the filing of the amended complaint in May 1990? The final question relates to the district court's decision to grant summary judgment on Atlantic's claims relating to WDNR outfalls 1 and 3. On these claims, Stroh concedes that Atlantic's notice was adequate to confer subject matter jurisdiction, but it persuaded the district court that Atlantic had not presented enough evidence of violations to survive summary judgment.

### A. The MMSD Claims

■ The Clean Water Act allows private citizens to sue any person "alleged to be in violation" of the conditions of an effluent standard or limitation under the Act or of an order issued with respect to such a standard or limitation by the Administrator of the Environmental Protection Agency (EPA) or a state. See 33 U.S.C. § 1365(a)(1). It is unlawful to discharge pollutants without any permit, see 33 U.S.C. § 1311(a); *Rueth v. United States E.P.A.,* 13 F.3d 227, 229 (7th Cir.1993); *Hoffman Homes, Inc. v. Administrator, United States E.P.A.,* 999 F.2d 256, 260 (7th Cir.1993), just as it is unlawful to discharge pollutants in violation of the terms of an existing NPDES permit, see 33 U.S.C. § 1342(a); see generally *Arkansas v. Oklahoma,* 503 U.S. 91, 105, 112 S.Ct. 1046, 1056, 117 L.Ed.2d 239 (1992) (outlining federal and state permitting scheme). Citizens may not bring suit, however, unless and until they have given 60 days' notice of their intent to sue to the alleged violator (as well as to the Administrator and the state). 33 U.S.C. § 1365(b)(1)(A). The purpose of this notice requirement, the Supreme Court explained in *Gwaltney,* "is to give [the alleged violator] an opportunity to bring itself into compliance with the Act and thus likewise render unnecessary a citizen suit." 484 U.S. at 60, 108 S.Ct. at 383. See also *Citizens for a Better Environment v. Steel Co.,* 90 F.3d 1237, 1242

(7th Cir.1996) (explaining · *Gwaltney* ), *cert. granted,* —— U.S. ——, 117 S.Ct. 1079, 137 L.Ed.2d 214 (1997). EPA regulations give further guidance on the contents of the notice, at 40 CFR § 135.3(a):

Notice regarding an alleged violation of an effluent standard or limitation or of an order with respect thereto, shall include sufficient information to permit the recipient to identify the specific standard, limitation, or order alleged to constitute a violation, the person or persons responsible for the alleged violation, the date or dates of such violation, and the full name, address, and telephone number of the person giving notice.

In practical terms, the notice must be sufficiently specific to inform the alleged violator about what it is doing wrong, so that it will know what corrective actions will avert a lawsuit.

■ In this case, Atlantic claims that its April 1989 notice clearly informed Stroh that it was complaining about Stroh's unauthorized discharges of die casting process wastewater to the MMSD sewers. The fact that Stroh later (1) obtained a permit covering those discharges from outfall 3, and then (2) re-routed the discharges to the newly defined outfall 4 after it built its treatment facility, does not change the adequacy of the original notice. Indeed, if anything it suggests that Stroh knew exactly what Atlantic was concerned about and it was actively taking steps to address the matter. Stroh, for its part, argues that the April 1989 notice specifically mentioned MMSD outfall 3, which had been closed down by the time the amended complaint (which was the first one to raise claims about discharges into the MMSD system) was filed in April 1990. Since Stroh had never received any notice mentioning new MMSD outfall 4 as a noncomplying "point source" for purposes of the Act, it reasons that Atlantic failed to meet the jurisdictional threshold for a citizen suit.

The premise of Stroh's argument is that the § 1365(b)(1)(A) notice must specifically identify the point source from which the allegedly offending discharge is emerging before the Act's jurisdictional requirements will be met. It relies on *Hallstrom v. Tillamook*

*County,* 493 U.S. 20, 110 S.Ct. 304, 107 L.Ed.2d 237 (1989), for this proposition, which held that compliance with the 60-day notice provision of the Act is a mandatory precondition to suit that cannot be disregarded by the district court. *Hallstrom,* however, said nothing about the content of the notice. It was undisputed that the plaintiffs there had given no notice at all to either Oregon's Department of Environmental Quality or the Administrator of the EPA, both of whom are clearly entitled to notice under the statute. Stroh's claim here is not that Atlantic failed to send its notice to one of the parties entitled to receive it; it is instead that the April 1989 notice was not specific enough to alert it to the claimed violation, and thus for purposes of new MMSD outfall 4 it was the equivalent of no notice at all.

With respect to content, Stroh argues that nothing less than a specific identification of the offending outfall would have sufficed. It finds support for this proposition in the Third Circuit's decision in *Public Interest Research Group of New Jersey, Inc. v. Hercules, Inc.,* 50 F.3d 1239 (3d Cir.1995), which held that a citizen plaintiff's initial notice of discharge violations was broad enough to encompass additional discharge violations and monitoring, reporting and record keeping violations occurring after the date of the notice letter. The claims, however, would have to be of the same "type" for this rule to hold, as the court explained:

[W]e hold that a notice letter which includes a list of discharge violations, by parameter, provides sufficient information for the recipients of the notice to identify violations of the same type (same parameter, same outfall) occurring during and after the period covered by the notice letter.

50 F.3d at 1250. The court went on to say that the citizen's burden was "to provide sufficient information of a violation, such as an excessive discharge, so that the permit holder and the agency can identify it." *Id.* at 1252. If subsequent investigation reveals a violation, then the court found that " 'complete compliance' should incorporate the correction of all such interconnected violations." *Id.*

We do not read the Third Circuit as establishing an inflexible rule that would require outfall-by-outfall notice in all cases. It was not faced with a case where the alleged polluter, upon receiving a notice about one offending outfall, simply redirected the stream of contaminated water to another outfall. The key to notice is to give the accused company the opportunity to correct the problem. Here, there is no question that Atlantic's April 1989 notice sufficiently informed Stroh about Atlantic's claim that its handling of the die casting wastewater did not comply with the statute. Stroh promptly secured a permit that covered exactly these discharges, under the outfall numbered 3 in the first MMSD permit. It began construction of a treatment facility, which it completed in June of 1990 (at least a month *after* the amended complaint was filed). It then re-routed the very same die casting wastewater to its newly numbered outfall 4. Moreover, it admitted in its May 29, 1990 letter to the MMSD that it was not in compliance and attempted to explain why it missed its deadline for its wastewater treatment system. These are not the actions of a company that has not received enough information for purposes of the statutory notice provisions of the Act. Nothing in the statute says that plaintiffs must refrain from filing suit when the company is attempting to take corrective action. Even though Atlantic did not file its amended complaint until well after the expiration of the minimum 60–day statutory waiting period (and thus eleven months after it could have sued), we find that the April 1989 notice satisfied the jurisdictional requirements of the statute.

Even if the notice was broad enough in scope and was timely, a second requirement for citizen suits is that the defendant must be "in violation" of a relevant standard, limitation, or order. In *Gwaltney,* the Supreme Court held that "[t]he most natural reading of 'to be in violation' is a requirement that citizen-plaintiffs allege a state of either continuous or intermittent violation—that is, a reasonable likelihood that a past polluter will continue to violate in the future." 484 U.S. at 57, 108 S.Ct. at 381. The Court held that this language precluded the possibility of a citizen suit based on a wholly past violation;

instead, the plaintiff must allege that the violations are ongoing at the time suit is brought. Justice Scalia would have gone further on the latter point and would have required the plaintiff to substantiate an allegation of an ongoing violation, if the point was contested. See *Gwaltney,* 484 U.S. at 69, 108 S.Ct. at 387. He agreed, however, that "[a] good or lucky day is not a state of compliance. Nor is the dubious state in which a past effluent problem is not recurring at the moment but the cause of that problem has not been completely and clearly eradicated." *Id.* Furthermore, he noted, without contradiction from the majority, that "it does not suffice to defeat subject-matter jurisdiction that the success of the attempted remedies becomes clear months or even weeks after the suit is filed." *Id.*

■ If the violation is cured at some point while the suit is pending, which for all we know may have occurred in this case, the case nevertheless does not become moot. It may be possible that the citizen plaintiffs would lose their right to an injunction, if, as the *Gwaltney* majority put it, "it is 'absolutely clear' that the allegedly wrongful behavior could not reasonably be expected to recur." (Emphasis in original; quoting from *United States v. Concentrated Phosphate Export Ass'n,* 393 U.S. 199, 203, 89 S.Ct. 361, 364, 21 L.Ed.2d 344 (1968).) In addition to injunctive relief, however, the statute provides for civil penalties under 33 U.S.C. § 1319(d), which would be recoverable for any time period in which Stroh was found to be in violation. Thus, if Atlantic adequately alleged that Stroh was either a continuous or intermittent violator at the time of suit—which we again take to be the date of the amended complaint—it has satisfied this prerequisite for suit as well. Accord *Atlantic States Legal Foundation Inc. v. Tyson Foods Inc.,* 897 F.2d 1128, 1135 (11th Cir.1990).

■ Looking only at the allegations, which would be pertinent to a motion under Fed. R.Civ.P. 12(b)(6), it is easy to conclude that Atlantic adequately alleged that Stroh was "in violation" of the Act in the sense that *Gwaltney* used the term. For purposes of summary judgment, though, we think that

the question whether the defendant was in violation at the time of the suit is one of fact. In keeping with the majority's decision in the Supreme Court to require the plaintiff only to allege in good faith the present nature of the violation, the Fifth Circuit has concluded that the burden of coming forward with evidence to show that the plaintiff's allegation is false rests on the defendant at the summary judgment stage. See *Carr v. Alta Verde Indus., Inc.*, 931 F.2d 1055 (5th Cir.1991). At the trial, of course, the burden of proving the ultimate violation rests on the plaintiff, because at that point the violation is an element of the substantive case rather than a jurisdictional hurdle.

We think the Fifth Circuit's approach sensibly accommodates the *Gwaltney* holding and the nature of summary judgment practice. Here, Stroh made no showing that Atlantic's allegations of the violations in connection with its discharges of die casting wastewater were not made in good faith, and it is clear that if the notice encompasses new outfall 4, the violation had certainly not ceased by the time the amended complaint was filed.

■ This leaves only the effect of the various delays in this proceeding on Atlantic's ability now to proceed with its suit. As we noted above, the delay has not made the case moot. Stroh realizes that the district court had discretion to consider whether to accept the filing of the amended complaint six months after it had dismissed the original complaint. See Fed.R.Civ.P. 15(a); *Otis v. City of Chicago*, 29 F.3d 1159, 1163 (7th Cir.1994). Bearing in mind both the breadth of that discretion and the fact that Stroh itself could have moved at any point after the November 14, 1989, order of dismissal for entry of a Rule 58 final judgment (but did not), we are not inclined to second-guess the district court's handling of the case. The greater part of the delay occurred between the filing of the new motions for summary judgment in 1992 and the new district judge's ruling in 1996. While this is certainly regrettable, Atlantic is no more responsible for this desuetude than Stroh (or the court). We therefore conclude that Atlantic is entitled to go forward on its claims relating to the discharges of die casting wastewater into the MMSD sewerage system.

### B. *The WDNR Claims*

■ The district court dismissed Atlantic's claim relating to discharges at WDNR outfalls 1 and 3 because it found that a laboratory letter reporting that too much oil and grease had been discharged at outfall 3 in February 1992 was based on a faulty test. Stroh alleged that the sample result was in error, claiming that its Discharge Monitoring Report on which the excess discharge was reported had also contained the following notation: "Note: Attached lab report shows lab process error." No such report was ever found in WDNR's files. Stroh then submitted a letter dated May 13, 1992, from the laboratory that performed the test, which said:

As part of the method, an oil standard of known concentration is analyzed along with the samples to determine the accuracy of the analyses. The standard that was run on February 27 had a recovery of 50%. This is below our acceptance level. This could indicate that there was a problem with the O & G analyses that day, meaning that the results for your two samples tested that day may not be accurate.

Taking both the May letter and the lab report into account, the district court concluded that Atlantic had not met its summary judgment burden of coming forward with evidence to show that Stroh was indeed a continuing or intermittent violator of the WDNR permit covering WDNR outfalls 1 and 3.

We note initially that the record appears to be devoid of any evidence from Atlantic that relates to WDNR outfall 1. The district court therefore correctly dismissed Atlantic's claims relating to that outfall from the case. With respect to WDNR outfall 3, the case is much closer. On the one hand, as Atlantic points out, the lab letter, taken in the light most favorable to Atlantic, implies that the flaw in the data led to an *under-reporting* of the actual levels of oil and grease, not to an excessive report. From that perspective, Stroh may have exceeded its permissible limits by 2 or 3 milligrams, rather than the 1 milligram that the lab found. On the other

hand, Atlantic does not direct us to any other evidence in the record that suggests either continuous or intermittent violations at WDNR outfall 3. We must therefore decide whether the lab report, taken alone, is enough to defeat Stroh's motion for summary judgment.

Bearing in mind both the court's obligation on summary judgment to view the facts in the light most favorable to the party opposing the motion, and the legal requirement for the company to show that it had "clearly achieved the effect of curing all past violations by the time suit was brought," *Gwaltney,* 484 U.S. at 69–70, 108 S.Ct. at 388 (Scalia, *J.,* concurring), we think Atlantic should have been entitled to proceed on its claims regarding WDNR outfall 3. If Stroh discharged excess oil and grease into the Bluemound tributary on one occasion after the date of the suit, a finder of fact could infer that Stroh had not fully cured all past violations by the time suit was brought. It is unclear how much relief this will bring for Atlantic, if the provable violations are so sparse, but that goes to the merits of the suit, not to the jurisdictional threshold.

We therefore Affirm the district court's dismissal of Atlantic's claims with respect to WDNR outfall 1, and we Reverse and Remand for further proceedings with respect to WDNR outfall 3 and the claims regarding the die casting wastewater that was routed to new MMSD outfall 4. Each party is to bear its own costs on appeal.

MANION, Circuit Judge, concurring in part and dissenting in part.

Although I agree that the dismissal of Atlantic's claims with respect to WDNR outfall 1 should be affirmed, I do not concur with the court's reversal of the district court's dismissal of claims with respect to outfall 3. In my opinion the court reads the notice and continuing violator requirements of the Clean Water Act, 33 U.S.C. § 1365 *et seq.,* too broadly. Accordingly, I would affirm the district court's dismissal of Atlantic's claims in total.

I.

Stroh Die Casting Company manufactures zinc and aluminum castings in its Milwaukee, Wisconsin plant. The Wisconsin Department of Natural Resources ("WDNR") has issued Stroh permits to discharge industrial wastewater through various outfalls into storm sewers which flow into Lake Michigan.

The Clean Water Act enables citizens to seek injunctive relief, civil penalties, and forfeitures (as well as attorneys' fees) if violations of the Act are proved. Atlantic States Legal Foundation claims that Stroh violated the Act. In a November 8, 1988 letter from its law firm, Atlantic gave Stroh notice of its intent to sue in 60 days for certain purported violations of the Act, as 33 U.S.C. § 1365(b) requires Atlantic to do. In that notice, Atlantic alleged that Stroh had exceeded the daily maximum discharge limits for oil, grease, and "biological oxygen demand 5" allowed under the WDNR permit for WDNR outfalls 1 and 3. Nearly 3 months later, Atlantic filed suit against Stroh based on the notice. Pursuant to Fed.R.Civ. P. 12(b)(1), Stroh moved to dismiss Atlantic's claims for lack of subject matter jurisdiction, arguing that Atlantic could not satisfy the requirements for a citizen suit under 33 U.S.C. § 1365(a) because any violations of the Act occurred in the past; Atlantic had failed to allege a state of continuing pollution, an impediment to recovery under the Act after *Gwaltney v. Chesapeake Bay Found., Inc.,* 484 U.S. 49, 57, 64, 108 S.Ct. 376, 381, 385, 98 L.Ed.2d 306 (1987).

Rather than opposing Stroh's motion to dismiss, on April 13, 1989, again in a letter from its law firm, Atlantic sent Stroh a second 60–day notice of intent to sue. That letter alleged Stroh had exceeded the maximum allowances for zinc, total phenol, and again for oil and grease, as well as that Stroh discharged diecasting wastewater into Milwaukee Metropolitan Sewerage District ("MMSD") sewers without a permit. As a location for this discharge, the second notice mentions only "outfall 003"; the parties agree this refers to MMSD outfall 3. Three months later, the MMSD did issue Stroh an industrial wastewater discharge permit which defined five separate outfalls and set their

effluent limitations. Under that permit, Stroh continued to discharge its industrial wastewater through MMSD outfalls 1, 3, and 4. After July 1989, these outfalls were monitored, tested, and reported to the MMSD.

Because Atlantic never responded to Stroh's motion to dismiss and thus had waived the right to do so, the district court dismissed Atlantic's suit without prejudice on November 14, 1989. Over six months later, on May 7, 1990, Atlantic filed an amended complaint alleging the same violations noticed in the April 13, 1989 letter. The district court accepted the filing, reopening this case.

In the meantime, Stroh had been designing and installing a new wastewater treatment system for its plant. In May 1990, Stroh wrote the MMSD explaining that it had failed to comply with an April 10, 1990 deadline for completing the new system because of a personnel difficulty, late delivery of the new system from the manufacturer, and installation problems. In June 1990, Stroh completed the installation of the new system, which combined the wastewater previously discharged at MMSD outfalls 1 and 3 with that discharged at MMSD outfall 4, pumped it through an ultrafiltration unit to extract all grease and oil, then through a pretreatment system, and then discharged the water only from MMSD outfall 4. MMSD outfalls 1 and 3 were later used for expelling waste and water not limited by the permit.

On October 23, 1990, the MMSD issued Stroh a new discharge permit which reflected the new outfalls and new treatment system. The last reported exceedence at WDNR outfall 3 occurred on February 27, 1990, although a February 2, 1992 laboratory test revealed that Stroh had exceeded the 10 milligrams per liter level for oil and grease at that outfall by 1 milligram. Stroh challenged the accuracy of that test, submitting a March 1992 letter in which the laboratory admitted that their oil measurements were off by 50% that day. Atlantic responded that the lab's admitted error could only cut in its favor—that the flaw in the data would have led to under-, not over-reporting.

When Atlantic filed the amended complaint and the district court reopened the case, Stroh moved to vacate the court's ruling to reopen. The district court denied that motion, and the parties filed cross-motions for summary judgment. The district court granted Stroh's summary judgment motion, denied Atlantic's, and dismissed Atlantic's amended complaint.

## II.

The court first concludes that the April 1989 (second) notice to Stroh satisfied the jurisdictional requirements of 33 U.S.C. § 1365(b)(1)(A). I agree with the district court that Atlantic failed to fulfill the statutory condition precedent by notifying the proper parties, including Stroh, of any alleged violations at MMSD outfall 4, and therefore that any such violations are beyond the scope of this suit.

The court concludes that "there is no question that Atlantic's April 1989 notice sufficiently informed Stroh about Atlantic's claim that its handling of the die casting wastewater did not comply with the statute." *Ante* at p. 820. It so concludes by examining Stroh's *post*-complaint actions: securing a permit that covered the discharges, constructing a new wastewater treatment facility, re-routing the diecasting wastewater to newly numbered outfall 4, and admitting it was not in compliance in its May 1990 letter to the MMSD. *Id.* The court surmises that "these are not the actions of a company that has not received enough information for purposes of the statutory notice provisions of the Act." *Ante* at p. 820. But "[t]he mere chronological sequence of events does not establish a causal connection." *Brennan v. United Steelworkers of America*, 554 F.2d 586, 614 (Aldisert, J., dissenting).

It is undisputed that Atlantic's first notice of intent to sue on November 8, 1988 did not mention discharge into the MMSD, and that the second notice on April 13, 1989 mentions only MMSD outfall 3, not MMSD outfall 4. The April 13th letter refers to discharges of "process water into Lake Michigan via the [MMSD]" and that Stroh "has violated and continues to violate an 'effluent standard or limitation' by discharging die casting process wastewater to MMSD without a pretreat-

ment discharge permit." The letter then lists six specific examples of exceedences, each emitting from what the parties do not dispute is MMSD outfall 3. But Atlantic notified Stroh of this information when Stroh was correcting discharges from MMSD outfalls 1 and 3, *not* MMSD outfall 4. And Atlantic had easy access to all records of Stroh's emissions, but made no mention of MMSD outfall 4 in this second notice, while specifically mentioning MMSD outfall 3. After specifically noticing only violations at outfall 3, it is wrong to include in this suit alleged violations at MMSD outfall 4 without notice to Stroh.

The Third Circuit more properly handled a situation similar to this. In *Public Interest Research Group of New Jersey v. Hercules, Inc.,* 50 F.3d 1239 (3d Cir.1995), citizen plaintiffs sent out a notice of an intent to sue listing 68 discharges which allegedly occurred in violation of Hercules' permits. *Id.* at 1243. As in this case, the district court held that pre-complaint discharge violations not included in the plaintiffs' notice letter could not be included in the suit unless listed in a subsequent notice, and granted the defendant summary judgment. *Id.* at 1250. The Third Circuit reversed this holding, concluding that

> a notice letter which includes a list of discharge violations, by parameter, provides sufficient information for the recipients of the notice to identify violations of the same type (same parameter, **same outfall**) occurring during and after the period covered by the notice letter.

*Id.* (emphasis supplied). The *Hercules* decision supplies a workable, bright-line rule to apply in cases such as this: violations "which are of the same type (same parameter, same outfall) as the alleged violations included in the plaintiffs' 60-day notice letter," *id.,* should be deemed properly noticed.

In attempting to distinguish *Hercules,* my colleagues assert the Third Circuit "was not faced with a case where the alleged polluter, upon receiving a notice about one offending outfall, simply redirected the stream of contaminated water to another outfall." *Ante* at p. 820. But the record does not support the metaphor that Stroh played a shell game

with the regulatory authorities (and Atlantic) by constructing the new wastewater treatment. Although Stroh's new system was installed in June 1990, three weeks after the amended complaint, it was designed from late 1989 to early 1990. During that time period only the original complaint was on file, which had been dismissed for, in effect, failure to prosecute. That complaint was based on the first notice to sue, which concerned solely WDNR outfalls 1 and 3. Further, the April 1989 notice made no mention of MMSD outfall 4. The installation of highly technical wastewater treatment equipment cost Stroh hundreds of thousands of dollars and was implemented on a schedule closely monitored by the MMSD. Its purpose was to consolidate, update, and improve Stroh's treatment of wastewater. Stroh met with sewerage district officials concerning the two month delay in installing the new system, and explained the reasons for the delay in writing. To treat *all* of its wastewater through the new system, Stroh combined the three existing streams (which previously had been discharged at MMSD outfalls 1, 3, and 4) and routed them through its new system, with the treated water then discharged at new MMSD outfall 4. All of these facts lead to the conclusion that Stroh methodically and effectively addressed the problem, not that it hid the pea.

It is undisputed that MMSD outfall 4 was not a new outfall through which Stroh creatively re-routed wastewater to discharge. Stroh had operated MMSD outfall 4 as a separate and distinct outfall since July 1989, and it had separate effluent limitations since the original MMSD permit. Because reports from MMSD outfall 4 were available from July 1989 onward, Atlantic had access to the information necessary to provide Stroh, the EPA, and the WDNR with an appropriate notice of intent to sue for any violations at MMSD outfall 4. Atlantic did not do so. As the Supreme Court stated in *Gwaltney,* "the purpose of a notice to the alleged violator is to give it an opportunity to bring itself into complete compliance with the Act and thus likewise render unnecessary a citizen suit." 484 U.S. at 60, 108 S.Ct. at 383. For a notice to fulfill its function, the violator must be told

what the pollution is and where it occurred. This court should not rewrite the second notice on Atlantic's behalf to encompass information it had the opportunity to but did not include.

The consequence of the court's expansive reading could be catch-all notices sent to companies which, if construed broadly as the court has done here, would encompass any violation, past or future. This, of course, would undermine the dual purposes of the notice requirement: to provide governmental entities with the opportunity to begin an enforcement action before the citizen suit is filed, and to provide the alleged violator with enough information to be able to bring itself into compliance. See *Hercules*, 50 F.3d at 1249. In *Hercules*, the Third Circuit judged the sufficiency of the 60–day notice letter by "whether it accomplishes these purposes." *Id.* Because the April 13, 1989 notice letter in this case could not have given the EPA, the WDNR, or Stroh notice of a lack of compliance at MMSD outfall 4, this court should exclude from this suit any violations Atlantic alleges occurred there.

## III.

Even if proper notice is given, the Clean Water Act only permits a citizen to bring a civil action if a person is "in violation" of a relevant standard, limitation, or order. 33 U.S.C. § 1365(a)(1)(A). If the person charged is not "in violation," the plaintiff does not have standing under the Act. In *Gwaltney*, the Supreme Court set forth a test for standing under the Act: a plaintiff must make a "good-faith allegation of continuous or intermittent violation." 484 U.S. at 64, 108 S.Ct. at 385. This means that a citizen plaintiff does not have standing to maintain a suit for civil penalties for wholly past violations of the act.[1] Thus, for purposes of federal subject matter jurisdiction, citizen plaintiffs are required to show "a reasonable likelihood that a past polluter will continue to pollute in the future." *Id.* at 57, 108 S.Ct. at 381. Justice Scalia, joined by Justices Stevens and O'Connor, concurred in *Gwaltney* on exactly this issue. *Id.* at 67, 108 S.Ct. at 386–87. To them, standing should not turn on the plaintiff's good faith, but on the objective fact of whether the defendant was "in violation." *Id.* at 69, 108 S.Ct. at 387–88.

On remand in *Gwaltney*, the Fourth Circuit held that a citizen plaintiff may prove an ongoing violation in one of two ways:

> either (1) by proving violations that continue on or after the date the complaint is filed, or (2) by adducing evidence from which a reasonable trier of fact could find a continuing likelihood of the recurrence in intermittent or sporadic violations. Intermittent or sporadic violations do not cease to be ongoing until the date when there is no real likelihood of repetition....

890 F.2d 690, 693 (4th Cir.1989). "[E]very court thus far to consider this question" has adopted this test. *Carr v. Alta Verde Indus., Inc.*, 931 F.2d 1055, 1062 (5th Cir.1991).

The court decides that this case presents a fact question as to whether Stroh was "in violation" at the time of the suit (which I agree is the date of the amended complaint, May 7, 1990). It adopts the approach from *Carr* that "the defendant has the burden at the summary judgment stage to demonstrate that the plaintiff's allegations of a continuous or intermittent violation do not raise a genuine issue of material fact." 931 F.2d at 1062. The court has inserted a new "fact." Because "the [April 1989] notice encompasses new outfall 4, the violation had certainly not ceased by the time the amended complaint was filed." *Ante* at p. 821.

Because no violations at MMSD outfall 4 were properly noticed, this court should not conclude that any post-complaint exceedences at outfall 4 qualify Stroh as a continuing violator. Further, if Atlantic's second notice is given its proper scope not to include any exceedences at MMSD outfall 4, Atlantic does not have standing to bring this suit.

It is undisputed that the last permit exceedence at WDNR outfall 1 occurred in No-

---

1. This court clearly recognized this in *Citizens for a Better Environment v. Steel Co.*, 90 F.3d 1237 (7th Cir.1996). That case discussed how the Supreme Court in *Gwaltney* interpreted the present tense language of the Clean Water Act to bar suits for past violations, and how such suits would render the Act's statutory notice provision meaningless. *Id.* at 1242–43.

vember 1986, 3+ years before Atlantic filed its amended complaint. At MMSD outfall 3, there has not been a permit exceedence since June 1990, and there can be none, for since that date that outfall has been used to expel non-contact cooling water, not wastewater. Stroh's new wastewater treatment system has been permanently connected and all industrial process wastewater previously discharged at MMSD outfall 3 (which was the subject of Atlantic's April 13, 1989 notice) is discharged at MMSD outfall 4.

Atlantic argues that there is one reported exceedence at WDNR outfall 3 which was based on a faulty lab test, and that this should preclude summary judgment. Even if Atlantic is correct that any error in the lab test cuts in its favor, it has not met its burden to show that Stroh was an *ongoing or intermittent violator* at WDNR outfall 3. If those terms mean anything, they require more than the single 1 mg per liter oil exceedence identified by Atlantic. Only stretching "ongoing" and "intermittent" beyond their breaking point could a court conclude from a single, heavily disputed exceedence in February 1992 that Stroh is currently "in violation" of the Clean Water Act. *Cf. Public Interest Research Group of New Jersey v. Yates Industries, Inc.*, 757 F.Supp. 438, 447, *modified on other grounds*, 790 F.Supp. 511 (D.N.J. 1991) (permit holder may avoid liability at summary judgment if data in laboratory report presents direct evidence of inaccuracies). Even if Atlantic is correct that there was an exceedence in February 1992, according to the concurrence in *Gwaltney*, 484 U.S. at 69, 108 S.Ct. at 387–88, Atlantic must demonstrate that Stroh is in fact in violation of the Act. It should take more than an admittedly faulty lab result to satisfy this burden.

This case presents neither of the circumstances the Fourth Circuit recognized on remand in *Gwaltney* would prove an ongoing violation. It is undisputed that before Atlantic's notices, there were exceedences at WDNR outfall 3 and unauthorized discharge of diecasting wastewater into sewers. Between the second notice and the amended

complaint, Stroh obtained a comprehensive and demanding MMSD permit concerning its wastewater discharge. It also designed and built at its own great expense an entirely new MMSD wastewater processing facility which was put into place less than a month after Atlantic filed the amended complaint. Properly confining our review to noticed outfalls since the date of the amended complaint, there was a single, disputed exceedence of 1 milligram of oil at one outfall, the finding for which was in an admittedly erroneous lab report. These facts show Stroh "cleaned up its act," and is not reasonably likely to pollute in the future. The court's expansive reading of the "in violation" requirement places an unreasonable burden on the company. Under *Gwaltney*, Stroh simply does not qualify as an "ongoing violator." [2]

### IV.

I concur that the dismissal of Atlantic's claims with respect to WDNR outfall 1 should be affirmed, but I would dismiss the claim with regard to WDNR outfall 3 as well due to Atlantic's lack of standing.

For all of these reasons, I would affirm the opinion of the district court in full.

---

2. As the court recognizes, given that Stroh has had the new wastewater treatment system in place since June 1990, what truly may be at issue in this case is substantial attorneys' fees.